

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-24-00273-CV

_____

THOMAS F. SEWAK AND COLT ENERGY, INC., APPELLANTS

V.

SUTHERLAND ENERGY CO., LLC, APPELLEE

On Appeal from the 46th District Court
Hardeman County, Texas
Trial Court No. 11835, Honorable Cornell Curtis, Presiding

April 2, 2025

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and YARBROUGH, JJ.

Appellants Thomas F. Sewak and Colt Energy, Inc., appeal from the trial court's summary judgment against them on their breach of contract claim against Sutherland Energy Co., LLC. We reverse in part and affirm in part.

**BACKGROUND**

After drilling and completing a productive oil well known as the Hamrick #3 in Hardeman County, Sutherland Energy Co., LLC ("SEC") hired geophysicist Sewak,

operating through Colt Energy, Inc. ("Sewak"), to provide services in conjunction with a seismic survey of the surrounding area. The parties signed a letter of agreement in August of 2013 "to outline the scope of [their] relationship concerning the subject seismic survey and potential drilling and development." In the second paragraph, the agreement described Sewak's responsibilities as follows:

> By signing this letter you agree to be retained by Sutherland Energy Co., LLC (SEC) as a contract geophysicist concerning the subject seismic survey. Your responsibilities will include but not be limited to design, bidding, contracting, overseeing data acquisition and processing, and interpretation of the data. All costs associated with acquiring the survey will be borne by SEC. The seismic data will be the property of SEC. You will invoice SEC at a rate of $600/day (or $75/hr) for your time and expertise. SEC will also reimburse you for any normal out of pocket expenses. Invoices will be paid within 15 days of receipt.

The agreement further provided, in the fourth paragraph:

> In addition to the fees above and after fulfillment of those duties, SEC (including its successors and assigns) agrees to give you an option to invest in drilling opportunities within the subject survey on a ground floor basis for up to twenty percent (20%) of the working interest available to SEC. Ground floor basis means you will not be charged a prospect fee or incur any land or seismic expenses that SEC can apply to payout of the Hamrick #3 well. This option to invest does not include the right to flip or turn an interest to a third party and is limited in its term to seven years following the date of this letter.

Sewak began work in December of 2013. He sent his first invoice, covering work performed from December of 2013 through April of 2014, to SEC in June of 2014 and his second, covering work performed from August through December of 2014, in June of 2015. Both were timely paid by SEC.

By mid-October of 2014 or January of 2015, the survey data was completed to a point that Sewak and SEC could begin to identify prospects for drilling. Sewak continued providing geophysicist services through the first half of 2017. In June of 2017, Sewak wrote to SEC's president, Rod Sutherland, expressing disappointment that SEC had not

2

leased acreage known as the "Brooks Prospect." Sewak felt that the Brooks Prospect was one of the best potential drilling sites on the survey and that SEC's failure to lease it denied Sewak the opportunity to invest.

Sewak then sent SEC three more invoices: a September 2017 invoice covering work performed in 2015; an October 2017 invoice covering work performed in 2016, and a February 2018 invoice covering work performed in 2017. SEC did not pay Sewak's final three invoices.[1] SEC maintained that Sewak's work after January of 2015 did not fall under the category of acquiring the subject seismic survey, for which SEC had agreed to pay $600/day, but rather related to "prospecting" for drilling opportunities within the survey, which was a separate part of their agreement.

Per the agreement, the parties used data from the survey to search for prospective drilling sites. SEC offered Sewak the opportunity to invest in four wells drilled by SEC from 2015 to 2017. Sewak chose to invest in two of the four, the SEC Mabry #3 and SEC Hamrick #4. In May of 2017, SEC acquired a 49% interest in the Hamrick #3 Unit which had been donated to the National Christian Foundation ("NCF"), a charitable organization, after the Hamrick #3 well reached payout. SEC did not give Sewak an option to invest in the Hamrick #3 Unit. In December of 2018, SEC drilled the Hamrick #5, an offset well to the Hamrick #3. SEC did not offer Sewak an option to invest in the Hamrick #5, which was subject to a joint operating agreement with another party.

In June of 2020, Sewak filed suit alleging that SEC had breached the parties' contract by failing to pay his final three invoices and by denying him the option to

---

[1] During the course of litigation, SEC made a partial payment on the third invoice.

3

participate in drilling opportunities. Sewak filed a motion for partial summary judgment on the invoice issue. SEC filed a motion for summary judgment addressing both the invoice claim and the drilling dispute. The trial court denied Sewak's motion and granted SEC's motion. Sewak brought this appeal.

## ANALYSIS

By two issues, Sewak contends that summary judgment for SEC was improper on both the compensation issue and the drilling opportunities issue. We review summary judgments de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When faced with competing summary judgment motions where the trial court denied one and granted the other, we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered. *Id.*

Issue 1: Payment for Sewak's Work

In his first issue, Sewak asserts that the geophysicist work he performed concerning the seismic survey was within the scope of the parties' agreement and that SEC breached the agreement by failing to make full payment on the final three invoices for that work. SEC responds that, while it agreed to pay Sewak a day rate for his contract geophysicist work related to the survey, the work for which he billed under the final three invoices was "prospecting," for which SEC did not agree to pay.

The court's primary duty when construing an unambiguous contract is to ascertain the parties' true intent as expressed within the "four corners" of the contract. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). When a contract's meaning is

4

disputed, our objective is to ascertain and give effect to the intentions the parties have objectively manifested in the written instrument. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). Because objective intent controls, we focus on the contract's language. *Id.* at 763–64. Words are construed in the context in which they are used, which encompasses "the circumstances present when the contract was entered." *Id.* at 764. We avoid construing contracts in a way that renders contract language meaningless. *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) (per curiam).

Here, the parties do not dispute whether Sewak performed his obligations under the agreement or whether he performed the work for which he billed SEC. As Sewak contends, "The only dispute SEC has about the invoices is whether Sewak was supposed to be paid for all of his geophysicist work or only some of it." Sewak asserts that all the work he performed was work "concerning" the survey, as described in the second paragraph of the agreement. Such work included data acquisition, processing, and interpretation. He claims that the work was thus within the provision of the agreement under which he was to be paid a rate of $600 per day or $75 per hour. He further argues that such work was not outside the scope of the second paragraph simply because SEC granted him an investment option under the fourth paragraph.

SEC maintains that the agreement sets forth two separate components: (1) the seismic survey and (2) potential drilling and development. SEC argues that the "subject seismic survey" does not describe both the process of acquiring geological data and the subsequent development of the surveyed area. It claims that these separate elements signify that, after the survey ended, Sewak was not entitled to compensation at the $600-

5

per-day rate but rather would be compensated in the form of an option to invest in SEC's drilling projects. SEC contends that the phrase "after fulfillment of those duties" supports its position that the agreement envisions two separate periods of work with two separate compensation schemes. However, the text following "after fulfillment of those duties" does not describe a separate phase of work. It does not refer to "prospecting" or set forth different work responsibilities for Sewak.[2] Instead, it provides details about Sewak's option to invest:

> In addition to the fees above and after fulfillment of those duties, SEC (including its successors and assigns) agrees to give you an option to invest in drilling opportunities within the subject survey on a ground floor basis for up to twenty percent (20%) of the working interest available to SEC. Ground floor basis means you will not be charged a prospect fee or incur any land or seismic expenses that SEC can apply to payout of the Hamrick #3 well. This option to invest does not include the right to flip or turn an interest to a third party and is limited in its term to seven years following the date of this letter.

In sum, the agreement does not identify two distinct categories of work but rather identifies two distinct categories of compensation: (1) $600 per day for work performed "as a contract geophysicist concerning the subject seismic survey" and (2) the option to invest in drilling opportunities within the subject survey.

The option to invest described in paragraph 4 is "[i]n addition to" the fees Sewak would be paid under paragraph 2. When construing a contract, we typically give terms "their plain, ordinary, and generally accepted meaning." *In re Davenport*, 522 S.W.3d 452, 456–57 (Tex. 2017). "In addition to" does not mean "instead of." "In addition to"

---

[2] We further note that, after timely paying Sewak's second invoice in 2015, SEC did not inform Sewak that SEC considered Sewak's geophysicist work under the contract to be complete or that his work from that point forward would be considered "prospecting" and unpaid. At his deposition, Sutherland agreed that, until the middle of 2017, Sewak was "still providing geophysicist services to help [SEC]." However, according to Sutherland, Sewak was providing those services "for our mutual benefit, not just for [SEC]."

6

means "combined or associated with." *Addition*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2014). The agreement thus contemplates that Sewak would receive his option to invest combined with his daily rate. The investment option granted to Sewak under the fourth paragraph does not limit his entitlement to payment or the scope of his duties under the second paragraph.

For the foregoing reasons, we conclude that the trial court erred by granting summary judgment for SEC on the issue of SEC's failure to pay Sewak's final three invoices. We sustain Sewak's first issue, reverse the trial court's summary judgment as to this issue, and render judgment granting Sewak's competing motion for partial summary judgment.

Issue 2: Drilling Opportunities

In his second issue, Sewak asserts that summary judgment for SEC was improper because SEC clearly breached the agreement by denying Sewak his option to invest in certain drilling opportunities. Sewak identifies two drilling opportunities that he contends SEC failed to extend to him: first, SEC's re-acquisition of a 49% interest in the Hamrick #3 Unit from NCF and second, SEC's drilling of the Hamrick #5 well.[3] SEC has not argued that Sewak did not earn his option to invest under the terms of the agreement, but asserts that the agreement did not give Sewak the right to participate in the Hamrick #3 Unit.

---

[3] SEC filed a no-evidence motion for summary judgment arguing that Sewak presented no evidence of any other claimed drilling opportunities that SEC allegedly failed to extend to Sewak under the agreement.

When parties disagree over the meaning of an unambiguous contract, we determine the parties' intent by examining the entire agreement. *Heritage Res., Inc. v. NationsBank Co.*, 939 S.W.2d 118, 121 (Tex. 1996). Unless the agreement shows that the parties used a term in a technical or different sense, we give terms their plain, ordinary, and generally accepted meaning. *Id.*

We first consider whether SEC's purchase of a 49% interest in a lease from NCF was a "drilling opportunity." We construe "drilling opportunity" to mean the opportunity to participate in the drilling of a well. The acquisition of an interest in a lease with existing production is not the same as the drilling of a well. To construe the agreement as creating an interest in lease acquisitions would read into the agreement language that does not exist. The rules of contract construction prohibit courts from reading into an agreement and contemplating terms that were not included by the parties. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("[W]e may neither rewrite the parties' contract nor add to its language."). Thus, we cannot conclude that SEC breached the parties' agreement by failing to offer Sewak an option to participate in SEC's purchase of an interest in the Hamrick #3 Unit.

We next consider whether the Hamrick #5 Well, a new well drilled by SEC and Dimock[4] in December of 2018, constituted a "drilling opportunity" under the agreement. We must construe the phrase "drilling opportunity" in the context in which it was used in the parties' agreement. *See, e.g., URI,* 543 S.W.3d at 764.

---

[4] Dimock is the owner of the remaining 51% of the unit.

8

The option to invest created in the agreement is for "drilling opportunities within the subject survey on a ground floor basis for up to twenty percent (20%) of the working interest available to SEC." Further, "[g]round floor basis means [Sewak] will not be charged a prospect fee or incur any land or seismic expenses . . . ." SEC argues that, because the agreement provides for investment in drilling opportunities "on a ground floor basis," it excludes operations within an existing production unit. SEC maintains that the ground floor phase of a producing unit would have already been completed, as the owners of the unit would have already incurred the substantial expenses of developing the unit. Moreover, an existing unit has established investors: the unit owners. The unit owners own interests in the entire unit, not in particular wells. The 160-acre Hamrick #3 Unit, where the Hamrick #5 well was eventually drilled, had been designated before the parties signed their agreement. The unit was subject to the terms and restrictions of the Seismic Exploration and Farmout Agreement (SEFA) between SEC and Dimock, the original owner of the lease. References to the "ground floor basis" do not make sense when applied to existing unit operations. We avoid construing contracts in a way that renders contract language meaningless. *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 747 (Tex. 2020). We thus construe "drilling opportunities . . . on a ground floor basis" to reflect an intent for Sewak to get involved in a new drilling venture at the beginning stages, not an existing production unit, as this construction is most reasonable given the circumstances in which the parties reached their agreement. Therefore, we overrule Sewak's second issue on appeal and affirm the trial court's summary judgment for SEC as to this issue.

**CONCLUSION**

For the reasons set forth above, we reverse the trial court's summary judgment in favor of SEC as to the first issue and render judgment in Sewak's favor. We affirm the summary judgment granted in SEC's favor on the second issue.


Judy C. Parker
Justice