**AFFIRM; Opinion Filed December 29, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00423-CV**

**PLANO-5301 LEGACY DRIVE OWNER L.P., Appellant**
**V.**
**DPS HOLDINGS INC. AND KEURIG DR. PEPPER INC., Appellees**

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-04413-2021**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Rosenberg[1]
Opinion by Justice Rosenberg

Plano-5301 Legacy Drive Owner L.P. ("Legacy") appeals the summary judgment granted in favor of appellees DPS Holdings Inc. and Keurig Dr. Pepper Inc. (collectively, "DPS"). In its first issue, Legacy challenges the trial court's decisions to grant DPS's motion for summary judgment and deny its cross-motion for summary judgment. In its second issue, Legacy urges that, assuming its first issue is sustained, the trial court's award of attorney's fees, interest, and costs to DPS should be reversed and that instead Legacy should be awarded same as the prevailing

---

[1] The Hon. Barbara Rosenberg, Justice, Assigned

party. We affirm the trial court's judgment. Because all dispositive issues are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. 47.2(a), 47.4.

## BACKGROUND

Legacy and DPS are parties to a lease ("Lease") dated December 20, 2019, concerning property located at 5301 Legacy Drive in Plano, Texas ("Premises"), with Legacy as landlord and DPS Holdings Inc. as tenant; Keurig Dr. Pepper Inc. executed a guarantee agreement on the same date, pursuant to which it guaranteed DPS Holdings Inc.'s obligations under the Lease.

On February 13, 2021, Winter Storm Uri caused extensive damages to numerous homes and businesses in Texas, including the Premises. Among other obligations, the Lease required DPS to maintain policies of commercial general liability insurance with respect to the Premises. On March 2, Legacy sent a letter to DPS, in which it acknowledged DPS's pending insurance claim for the weather-related damages to the Premises. On March 26, DPS notified Legacy of its surrender of "the Premises that, with the exception of the conditions caused by the extreme weather event of February 2021, are in a condition substantially similar to that existing on the Commencement Date of the Lease." DPS continued to pay rent pursuant to the Lease until the expiration of the term on March 31. On April 2, Legacy notified DPS that it considered DPS to be a holdover tenant because DPS had not yet delivered insurance proceeds related to the damages caused in February. The insurer did not pay all proceeds due under the policy until July 23, at which

point they were paid directly to Legacy as an additional insured. DPS refused to pay any holdover rent.

On August 11, Legacy filed suit against DPS, asserting a claim for breach of contract. DPS answered, asserting affirmative defenses and counterclaims for breach of contract and declaratory judgment. The parties filed competing motions for summary judgment. On February 9, 2022, the trial court signed orders denying Legacy's motion and granting DPS's motion. On April 13, the trial judge signed an agreed final judgment that incorporated its previous orders and awarded attorney's fees to DPS and taxed all costs against Legacy. Legacy agreed to the judgment only as to form and specifically preserved—and disclaimed any waiver—of its right to appeal the merits of the judgment against it. This appeal followed.

### LEASE PROVISIONS

The Lease contained several provisions that are relevant to the parties' dispute. Article 4 required DPS to pay a fixed rent of $499,983.33 per month and additional rent of premiums for insurance maintained by Legacy.

Article 9 addressed repair and maintenance: (1) limiting Legacy's repair and replacement obligations to repair or replacement of "the structural elements of the Building's roof, foundation and exterior walls," (2) requiring DPS to repair, maintain

and replace the Premises as necessary to maintain the Premises, and (3) disclaiming any obligation of DPS to repair or restore the Premises in the case of casualty.[2]

Article 12 addressed insurance obligations of the parties. Among other obligations, the Lease required DPS to maintant policies of commercial general liability insurance with respect to the Premises, as well as business interruption and extra expense insurance and rental loss insurance. The Lease required DPS to include Legacy, Legacy's property management company, and Legacy's lender as additional insureds on the commercial general liability policy. The parties agreed to waive any claim each might have against the other for any damage to the Premises to the extent the same is insured against.

Article 13 addressed damage or destruction, in part requiring DPS to assign to Legacy the insurance proceeds received by DPS. And although the same article provided for the parties to terminate the Lease under certain circumstances, section 13.5 specified that, "In no event shall Rent abate by reason of Casualty."

Article 17 provided for surrender of the Premises and treatment of DPS as a holdover tenant. The two provisions both parties rely on are below:

> Section 17.1     Upon the expiration or earlier termination of this Lease (for any reason whatsoever), Tenant shall surrender to Landlord the Premises in a condition substantially similar to that existing on the

---

[2] Section 9.3 provided:

Notwithstanding the provisions of this Article 9 but subject to the terms and provisions of Article 13, Tenant shall have no obligation to repair or restore the Premises in the case of damage or destruction by fire or other casualty and shall have no obligation to make or pay for any replacements of any of the Building Systems at the expiration or earlier termination of this Lease.

Commencement Date, reasonable wear and tear and, provided that Tenant has delivered to Landlord all deductibles, self-retention amounts and insurance proceeds, Casualty excepted, broom clean and clear of debris, and in compliance with applicable Legal Requirements triggered by alterations or additions to the Premises made by or on behalf of Tenant after the Effective Date of the Purchase Agreement. Tenant shall have the obligation to coil all cables and wires that protrude from the interior surfaces of the walls or ceilings of the Premises and store adjacent to such walls or in the plenum, as applicable and use commercially reasonable efforts to avoid cutting any cables or wires in connection with Tenant's surrender of the Premises.

. . . .

Section 17.3    The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant to timely surrender possession of the Premises as aforesaid will be impossible to accurately measure. Accordingly, the parties agree that if Tenant fails to surrender the Premises upon the expiration or earlier termination of this Lease, then, the period commencing on such expiration or earlier termination and continuing until Tenant surrenders the Premises will be deemed a tenancy at sufferance under the terms and conditions of this Lease except that monthly Fixed Rent will be equal to two hundred percent (200%) of the Fixed Rent for the month preceding expiration of the Term. Nothing herein shall be deemed to grant Tenant any right to holdover, and in no event shall the acceptance of any such charge preclude Landlord from commencing and prosecuting any holdover, forcible entry and detainer, or eviction proceeding. Tenant hereby waives any right to contest, challenge or appeal any eviction and/or forcible entry and detainer proceedings initiated by Landlord in the event that Tenant fails to timely surrender the Premises in accordance with the terms hereof. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits or other consequential damages to Landlord resulting therefrom.

## DISCUSSION

We review the granting of a motion for summary judgment de novo. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013) (citing *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012)). When the trial court does not specify the grounds for its ruling, a summary judgment must be affirmed if any of the grounds on which judgment is sought are meritorious. *Id.* (citing *State v. Ninety Thousand Two Hundred Thirty–Five Dollars & No Cents in U.S. Currency*, 390 S.W.3d 289, 292 (Tex. 2013)). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review all the summary judgment evidence, determine all issues presented, and render the judgment the trial court should have. *Id.* (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009)).

In its first issue, Legacy argues it established as a matter of law—such that the trial court erred by denying its motion for summary judgment and granting DPS's motion—that because DPS failed to deliver all of the insurance proceeds to Legacy until after the expiration of the Lease, DPS failed to surrender the Premises and thus became a holdover tenant and liable to Legacy for holdover rent, and therefore its refusal to pay holdover rent to Legacy constituted a breach of the Lease. DPS responds the trial court correctly interpreted the Lease to conclude that the holdover provision did not apply under the circumstances presented here.

When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument. *James Constr. Group, LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 403 (Tex. 2022) (citing *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018)). We construe the language of an unambiguous contract according to its plain meaning, attempting to give effect to all provisions. *See id.* (citing *URI, Inc.*, 543 S.W.3d at 763–64; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). Texas courts regularly enforce unambiguous contract language agreed to by sophisticated parties in arms-length transactions. *See id.* (citing *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 673 (Tex. 2020)).

Here, the record establishes the following circumstances. The Premises were damaged by an extreme weather event on February 13, 2021, prior to the expiration of the Lease on March 31, 2021. DPS had previously acquired insurance coverage to remediate and restore the Premises. Prior to the expiration of the Lease, DPS made a claim under that insurance policy, had not yet received the insurance proceeds, and had advised Legacy of same. DPS paid all of the monthly fixed rent for February and March of 2021. On March 26, DPS notified Legacy that DPS Holdings, Inc. would be vacating and surrendering the Premises on the last day of the Lease term and that, with the exception of the conditions caused by the extreme weather event, it would be surrendering the Premises in a condition substantially similar to that existing on the beginning of the Lease term. On April 2, Legacy

–7–

notified DPS that because it had not received "all deductibles, self-retention amounts and insurance proceeds," it considered DPS to have failed to surrender the Premises, to be in holdover of the Lease, and to owe Legacy holdover rent. In addition to the funds to restore the damage to the Premises and the holdover rent, Legacy also expected "money to compensate for Plano Legacy's lost revenue for the period of time subsequent to March 31, 2021 that it will take to restore the building." DPS paid the deductible amount to Legacy on July 19, 2021, and the insurer paid the insurance proceeds to Legacy on July 23, 2021.

No one asserts—and no evidence exists in the record to suggest—that DPS failed to remove any of its property from the Premises or failed to pay the monthly rent amount; the crux of the parties' disagreement is the interpretation of the holdover provisions of the Lease, specifically articles 17.1 and 17.3, which are quoted *infra*. The relevant portion of article 17.1 relates to surrender of the Premises:

> Upon the expiration or earlier termination of this Lease (for any reason whatsoever), Tenant shall surrender to Landlord the Premises in a condition substantially similar to that existing on the Commencement Date, reasonable wear and tear and, provided that Tenant has delivered to Landlord all deductibles, self-retention amounts and insurance proceeds, Casualty excepted, broom clean and clear of debris, and in compliance with applicable Legal Requirements triggered by alterations or additions to the Premises made by or on behalf of Tenant after the Effective Date of the Purchase Agreement.

Although Legacy argues the terms indicate that DPS could not effectively surrender the Premises until the insurance proceeds and deductible related to the extreme winter weather damage were paid to Legacy, we disagree.

–8–

As an initial matter, we hold that article 17.1 is not ambiguous. We conclude article 17.1, which requires that DPS deliver to Legacy all insurance amounts, clearly excepts a "Casualty." The Lease defines "Casualty" in relevant part as follows: ". . . during the Term, the Premises or any part thereof shall be damaged or destroyed by fire or other casualty (each, a "Casualty") such that . . . the damage cannot be repaired on or before the date that is one hundred twenty (120) days before the Expiration Date. . . ." The damages here occurred fewer than sixty days prior to the Lease's expiration on March 31, 2021, and the repairs were estimated to take between sixty and ninety days to complete. Accordingly, the damages are a "Casualty" and therefore the fact that DPS had not received and provided to Legacy the insurance proceeds did not prevent it from surrendering the Premises under the plain terms of article 17.1.

Our conclusion regarding DPS's effective surrender of the Premises is further supported by other provisions within the Lease. The repair provisions specifically stated DPS had no obligation to repair or restore the Premises in the case of casualty. The Lease's insurance provisions required DPS, not Legacy, to maintain insurance coverage on the Premises.[3] The Lease even provided for the assignment of the

---

[3] Legacy's asset manager testified via sworn declaration that "the landlord is usually the party that is responsible for insuring the building" but that in this instance DPS was required to do so "because the size and commercial strength of DPS and KDP meant that they could procure the agreed insurance coverage more economically than [Legacy]."

insurance proceeds.[4]  The Lease also provided that it could be terminated due to casualty with only the insurance proceeds being owed by DPS.[5]  Thus, Legacy bore the risk that it would not be able to make any repairs until those proceeds were provided, a risk it mitigated to some extent by requiring it be an additional insured on the policy.  Similarly, Legacy required DPS to obtain rental loss coverage, which according to the terms of the Lease, only covered the term of the Lease.[6]

Legacy attempts to analogize these circumstances to similar cases where our sister courts of appeals have concluded the tenants were in holdover status, but we conclude these cases are distinguishable.  In *Cammack the Cook, L.L.C. v. Eastburn*, 296 S.W.3d 884, 892 (Tex. App.—Texarkana 2009, pet. denied), the lease required:

> At the expiration of the tenancy, Tenant shall surrender the Premises in good condition, reasonable wear and tear excepted . . . Tenant shall remove all its trade fixtures and any alterations or improvements, subject to the provisions of Section 5.5, before surrendering the Premises, and shall repair, at its own expense, any damage to the Premises caused thereby.

---

[4]  Tenant shall assign to Landlord the insurance proceeds received by Tenant under the insurance policies maintained . . . .

[5] Section 13.1 provided that in the event the Premises were "partially or totally damaged or destroyed by Casualty" and could not be repaired within 120 days after the Casualty, "Tenant or Landlord shall have the right . . . to terminate this Lease . . . ."  Section 13.3 provided that if "the Lease is terminated under the provisions of this Article 13, Landlord shall be entitled to the full proceeds of the insurance policies maintained pursuant to Section 12.1.2 . . . ."

[6]  Tenant shall, during the entire Term hereof, at its sole expense, keep in full force and effect, at least the following insurance policies:

. . . .

rental loss insurance in an amount of not less than the aggregate Annual Rent payable during the 12 consecutive calendar month Term including a six month extended period of indemnity including Landlord and Landlord's Mortgagee as the insureds and loss payees as their respective interests may appear covering all risks required to be covered by the insurance provided for in Section 12.1.2 above.

The court concluded that because the tenants failed to remove their improvements or restore the premises, the tenants had breached the lease. *Id.* at 893. In *Pinole Valley Trucking, Inc. v. Texas Development Co.*, No. 01-08-00599-CV, 2009 WL 1025750, at *3 (Tex. App.—Houston [1st Dist.] 2009, no pet.), the lease provided that tenant's failure to "surrender the Premises in good condition and repair" would permit the landlord to recover holdover rent as well as "costs arising out of loss or liability resulting from delay by tenant in so surrendering the Premises." The court concluded the evidence was sufficient to show the tenant damaged the property during its tenancy and triggered the holdover provision. *See id.* at *4. But, in both of these instances, the tenants were required to repair or restore the premises and failed to do so. As discussed above, DPS was not required to repair or restore damages from a casualty and was not required to remit the insurance proceeds from same in order to surrender the Premises.

We overrule Legacy's first issue. Because its second issue is premised on our sustaining its first, we need not address its second. *See* TEX. R. APP. 47.1.

## CONCLUSION

We affirm the trial court's summary judgment in favor of DPS.

/Barbara Rosenberg/
_____
BARBARA ROSENBERG
JUSTICE, ASSIGNED

220423F.P05

–11–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PLANO-5301 LEGACY DRIVE
OWNER L.P., Appellant

No. 05-22-00423-CV          V.

DPS HOLDINGS INC. AND
KEURIG DR. PEPPER INC.,
Appellees

On Appeal from the 429th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 429-04413-
2021.
Opinion delivered by Justice
Rosenberg. Justices Partida-Kipness
and Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees DPS HOLDINGS INC. AND KEURIG DR. PEPPER INC. recover their costs of this appeal from appellant PLANO-5301 LEGACY DRIVE OWNER L.P.

Judgment entered this 29th day of December 2022.