# Supreme Court of Texas

No. 22-0901

U.S. Polyco, Inc.,

*Petitioner*,

v.

Texas Central Business Lines Corporation,

*Respondent*

On Petition for Review from the
Court of Appeals for the Tenth District of Texas

**PER CURIAM**

The parties in this case disagree about the meaning of a particular provision in their land-improvement contract. The trial court interpreted that provision as a matter of law and instructed the jury accordingly, leaving the jury to resolve liability and damages. The court of appeals also interpreted the provision and reached the same result as the trial court by methodically applying well-established canons of construction. What requires our review is what happened next. The court of appeals determined that, despite its analysis of the contract's language, the provision was still insolubly ambiguous. It thus reversed the trial court's

judgment, which had been based on the jury's verdict, and ordered a new trial so that a jury could determine the meaning of the contractual text. The court of appeals provided this explanation:

> The record demonstrates that the parties strongly disagree about the intent of [the contractual provision] and its application. Given the disagreement about the intent behind and application of [that provision], and the multiple, reasonable interpretations of [it] outlined above, we conclude that [it] is ambiguous and cannot be construed as a matter of law.

__ S.W.3d __, 2022 WL 2977477, at *5 (Tex. App.—Waco 2022).

This analysis is erroneous for two basic reasons. First, like all other considerations beyond the contract's language and structure, parties' "disagreement" about their intent is irrelevant to whether that text is ambiguous. Parties who find themselves in a business dispute can always claim an extratextual "intent" that would serve a current litigation position. Second, the "multiple, reasonable interpretations" that the court of appeals invoked are illusory. If there *were* multiple interpretations and a court could not choose among them, then the text would be genuinely ambiguous and there would be no choice but to leave the question to a jury. But the multiple interpretations that the court was referencing here were merely the competing theories that the parties advanced about how to read *the text*—a dispute that both the trial and appellate courts had ably addressed as a matter of law.

The principles of contract interpretation at issue in this case are well established and of fundamental importance. Without hearing oral argument, we grant the petition for review, reverse the judgment below, and remand for the court of appeals to address the parties' remaining

2

arguments.

* * *

Petitioner U.S. Polyco, Inc. manufactures and sells asphalt products throughout the United States. In early 2013, Polyco sought to expand its business by building a new manufacturing plant that would have direct railroad service. To that end, Polyco contacted respondent Texas Central Business Lines Corporation, a short-line freight railroad company. After several months of negotiation, the two companies agreed that (1) Polyco would use an undeveloped parcel of land leased by Texas Central for Polyco's new asphalt manufacturing plant and (2) Polyco would use Texas Central's railroad service for its asphalt shipments.

The parties memorialized these agreements in two contracts. The "Transload Agreement" governed how Polyco would "transload" its asphalt shipments—that is, how it would transfer them from railcar to truck. The "Railroad Allowance Agreement" generally governed how the parties would develop and improve the undeveloped parcel of land for Polyco's asphalt plant and transloading operations. Both contracts also addressed how certain costs would be allocated once the project was underway.

The primary issue before this Court concerns how the Railroad Allowance Agreement allocated the costs of building infrastructure on the undeveloped parcel between Polyco and Texas Central. Polyco agreed to advance up to $1.2 million to make "TCB Infrastructure Improvements" as defined in Section 1.1 of the Agreement. The parties dispute whether Section 1.1(3)'s requirement of a further written agreement—italicized in the following reproduction of the text—applies to everything listed in Section 1.1(3) or only to the reference to "other items" that immediately

3

precedes the "in writing" requirement:

> **1.1 TCB Infrastructure Improvements**. As used in this Agreement: "TCB Infrastructure Improvements" will mean the following improvements agreed to and shown generally in Exhibit X attached and incorporated into this Agreement by this reference ("Preliminary Layout"): . . . (3) various concrete and ground surface improvements, including without limitation slabs for truck scales and racks, tank and appurtenant structures to house personnel, oil heating and steam generation equipment, curbs and planters for parking areas, *and other items in or adjacent to the Designated Areas as are agreed upon by TCB and [Polyco] in writing*. All TCB Infrastructure Improvements constructed or provided for under this Agreement will be the sole property of TCB upon completion and are intended for the primary use of TCB in the conduct of its railroad operations.

(Emphasis added.) The scope of the "in writing" provision determines whether Polyco had to obtain Texas Central's further written agreement for work involving concrete slabs on the land.

According to Texas Central, Polyco's contract with a third party to construct those slabs (and other contracts) led Polyco to incur expenses far above its $1.2 million advance. Because Polyco did not obtain Texas Central's written agreement about such improvements, Texas Central reasoned, the improvements did not qualify as "infrastructure" that Texas Central was obligated to fund under Section 1.1(3). Polyco countered that no such written agreement was required. Only "other items in or adjacent to" the property required separate written agreements, Polyco argued, but concrete slabs were already specifically listed as infrastructure in Section 1.1(3). The parties' disagreement, in other words, turned entirely on the syntactic issue of how far the "in writing" requirement reached back into Section 1.1(3).

4

Polyco sued Texas Central for breach of contract and moved for partial summary judgment on this interpretive issue. The trial court granted the motion, specifically holding that:

> Under paragraph 1.1(3) of the Railroad Allowance Agreement . . . , the phrase "as are agreed upon by TCB and Customer in writing" modifies only the phrase "other items in or adjacent to the Designated Areas" and does not modify the phrase "various concrete and ground surface improvements, including without limitation slabs for truck scales and racks, tank and appurtenant structures to house personnel, oil heating and steam generation equipment, curbs and planters for parking areas."

The parties proceeded to a jury trial on their respective breach-of-contract claims, and the trial court's jury instructions were consistent with its interpretation of Section 1.1(3). The jury found that Texas Central had breached the Railroad Allowance Agreement. The court then awarded Polyco almost $9 million in damages and approximately $2 million in prejudgment interest and attorney's fees.

Texas Central appealed, arguing (among other things) that the trial court erred in its reading of Section 1.1(3). Reviewing the issue de novo, the court of appeals applied two relevant canons of construction: the series-qualifier canon and the last-antecedent canon. Under the series-qualifier canon, the court reasoned, "the phrase 'as are agreed upon by [Texas Central] and [Polyco] in writing' would modify all items in the series listed in section 1.1(3) . . ., including 'various concrete and ground surface improvements.'" 2022 WL 2977477, at *4. But under the last-antecedent canon, the court said, "the phrase 'as are agreed upon by [Texas Central] and [Polyco] in writing' would only modify the last item in the series, which is the phrase 'other items in or adjacent to the

5

[property].'" *Id.* Standing alone, either canon "might reasonably apply to this text," the court of appeals explained, but "'[p]unctuation is a permissible indicator of meaning,'" and "based on the absence of a comma" before the "as are agreed in writing" phrase, that phrase "appears to only apply to 'other items in or adjacent to the [property],' as suggested by the last-antecedent doctrine." *Id.* at *5 (quoting *Sullivan v. Abraham*, 488 S.W.3d 294, 297 (Tex. 2016)). This result is precisely what the trial court had reached.

The analytical approach undergirding that result is consistent with our general principles of contract interpretation, and it would have been unremarkable but for the fact that the court of appeals' reasoning did not stop there. In a subsequent section titled "Other Considerations," the court ventured beyond the contractual text. "Despite the foregoing," the court of appeals continued, "[t]he record demonstrates that the parties strongly disagree about the intent of section 1.1(3) of the [Railroad Allowance Agreement] and its application." *Id.* And "[g]iven the disagreement about the intent behind the application of section 1.1(3) of the [Railroad Allowance Agreement], and the multiple, reasonable interpretations of [it] outlined above, we conclude that section 1.1(3) . . . is ambiguous and cannot be construed as a matter of law." *Id.* The court accordingly reversed the trial court's judgment and remanded for a new trial so that a jury could resolve the purported ambiguity. *Id.* at *7. Polyco petitioned for review.

Our "primary objective" when construing private legal instruments like the parties' Railroad Allowance Agreement here "is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI,*

6

*Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). "In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls." *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968). Thus, when a contract is unambiguous, it will "be enforced as written without considering extrinsic evidence bearing on the parties' subjective intent." *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023). Our cases reiterating these points are legion.

The court of appeals, quite correctly, began its analysis by applying two relevant canons of construction and observing that they might reasonably point in different directions. Canons often do; the last-antecedent and series-qualifier canons generally will. The task of the court is to assess the language, structure, and context of a written instrument to determine which principle carries more weight and relevance. That is why the court of appeals—again, correctly—determined that, in *this* context, the punctuation of Section 1.1(3) favored the last-antecedent canon's application. Had the court of appeals affirmed the trial court's reading, its decision would have squarely aligned with our decision in *Sullivan*, in which we applied the last-antecedent canon based largely on the Legislature's inclusion of an Oxford comma in a provision of the Texas Citizens Participation Act. *See* 488 S.W.3d at 297-99.

As we emphasized in *Sullivan*, "use of the Oxford comma," while instructive, "is not definitive." *Id.* at 299. This case illustrates the point. The omission of an Oxford comma here only reveals the lack of anything else in the text or context that supports the notion that the parties intended the "in writing" requirement at the end of Section 1.1(3) to

7

govern *everything* in that section.  Had they so intended, they had multiple structural and syntactical tools—not merely the use of a comma—to achieve that result.

By choosing instead to itemize distinct improvements in Section 1.1(3) and include the writing requirement only at the *end*, the comma's absence is instructive because it conveys that the "in writing" provision is simply part of the final item in the list.  The point is that *something* is needed to link that phrase to what goes before—perhaps a comma, perhaps distinct placement of the requirement, perhaps making it a separate sentence.

Instead, Section 1.1's structure and syntax—together with its incorporated exhibit—indicate the opposite.  The introductory portion of Section 1.1 explains that "'TCB Infrastructure Improvements' will mean the following improvements *agreed to* and *shown* generally in Exhibit X attached and incorporated into this Agreement." (Emphases added.) Among the "following" improvements are "(3) various concrete and ground surface improvements, including without limitation slabs for truck scales and racks, tank and appurtenant structures to house personnel, oil heating and steam generation equipment, curbs and planters for parking areas."  And Exhibit X shows such improvements.

In signing the written Railroad Allowance Agreement, the parties specified that they "agreed to" these expressly identified improvements, including slabs.  *This* contract is the one that provides agreement for those items, and no further agreement is needed.  They also added as the last phrase of Section 1.1(3) "and other items in or adjacent to the Designated Areas as are agreed upon by [Texas Central] and [Polyco] in

8

writing." The word "are" in this context signals that this phrase encompasses additional improvements that the parties may agree to in writing in the future.

It is not reasonable to interpret this final phrase as imposing a future writing requirement on the improvements listed earlier in Section 1.1(3) and shown on Exhibit X. That reading is inconsistent with the written statement at the beginning of Section 1.1 that the parties "agreed to" the listed and shown improvements. The final phrase of Section 1.1(3) plays a different role. It first acknowledges that unanticipated infrastructure improvements may be needed—it eliminates any doubt regarding whether the specified projects will be sufficient. It then eliminates any doubt about how to proceed when such a need arises by creating the mutual obligation of a written agreement about them.

We thus cannot adopt, or deem as a reasonable competitor, Texas Central's more unnatural reading of the agreement. That reading would require us to conclude that the parties intended to mandate an agreement "in writing" to items *already* listed in Section 1.1(3), thus necessitating not one but two written agreements regarding the same thing—without any textual basis for adopting such a reading.

The court of appeals accordingly erred by concluding that there were "multiple, reasonable interpretations" of Section 1.1(3). 2022 WL 2977477, at *5. By "multiple," it simply meant two—the two we have already examined, only one of which we can embrace. And by "reasonable," it simply meant plausible, but lawyers in litigation can often generate plausible arguments to advance their clients' position. As we have observed before, a "contract is not ambiguous merely because the

parties disagree about its meaning." *Kleberg County*, 543 S.W.3d at 763. When there is a plausible basis for dispute, lawyers *should* disagree by making the strongest available arguments for their clients; counsel in this case have discharged that duty well and honorably. But such disagreement is not a basis for a court to abandon the interpretive task—it is what makes that task needed. Whenever possible, courts must assess adverse arguments and resolve a text's meaning as a matter of law.[1] And, like discounting the mere existence of disagreement, we have cautioned courts against considering parties' subjective intent when resolving a contract's meaning. *See, e.g.*, *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 240 n.17 (Tex. 2022).[2] Accordingly, in litigation, it

---

[1] We reaffirm, of course, that genuine ambiguity leaves courts with no recourse but to turn the matter over to a jury. "Courts should endeavor to give meaning to the text without too hastily finding ambiguity, but there may be times in which no other choice remains." *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 365 (Tex. 2023). Concluding that a legal instrument is insolubly ambiguous must always come *after* a court has exhausted all the traditional tools of interpretation and still cannot reach a definitive conclusion about the meaning conveyed by the text.

[2] That contract interpretation is an "objective" endeavor is a proposition we have stated in countless opinions. *See, e.g.*, *Kleberg County*, 543 S.W.3d at 764 ("Objective manifestations of intent control . . . ."); *Reed v. Wylie*, 554 S.W.2d 169, 182 (Tex. 1977) (Daniel, J., dissenting) ("[O]ur decisions in the past have not been concerned with [the parties'] subjective intent . . . ."); *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) ("The objective intent as expressed in the agreement controls the construction of an unambiguous contract . . . ."); *Luckel v. White*, 819 S.W.2d 459, 462 (Tex. 1991) ("[I]t is not the actual intent of the parties that governs, but the actual intent of the parties *as expressed in the instrument as a whole* . . . ."); *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) ("[T]he instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls." (quoting *City of Pinehurst*, 432 S.W.2d at 518)); *American-Amicable Life Ins. Co. v. Lawson*, 419 S.W.2d 823, 826 (Tex. 1967) (same); *Republic Nat'l Life Ins. Co. v. Spillars*, 368 S.W.2d 92, 94 (Tex. 1963) (same).

is not noteworthy—or at least not material—that the "record demonstrates that the parties strongly disagree about the intent of" a contract. 2022 WL 2977477, at *5. If lawyerly disagreement about text meant that a legal instrument's disputed meaning must be resolved as a matter of fact, it would be a poor advocate who could not obtain a jury trial to interpret the text.

To its credit, Texas Central defends at least the *result* of the decision below with arguments that are more text-centered. Texas Central specifically urges us to consider the Railroad Allowance Agreement more holistically and contends that various pieces of context surrounding Section 1.1(3) favor its series-qualifier interpretation. Context is certainly a permissible indicator of meaning, *see, e.g.*, *Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023), and courts must strive to "harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005).

The major premise of Texas Central's argument (that context matters) is sound, but its minor premise (that there is any contextual basis for reading this text differently) is not. Texas Central first argues that other provisions in the Railroad Allowance Agreement reveal the parties' larger intent to give Texas Central control over the infrastructure process. An introductory paragraph of the Railroad Allowance Agreement provides that one of the agreement's purposes is to "facilitate" Texas Central's infrastructure improvements, Section 1.3.2 gives Texas Central control over which contractors are chosen for construction, and the second sentence of Section 1.1 provides that the improvements will ultimately be

11

Texas Central's "sole property" and "are intended for [its] primary use . . . in the conduct of its railroad operations." Only by reading Section 1.1(3) to require Texas Central's written consent for all items listed, Texas Central submits, will Section 1.1(3) be consistent with these provisions and the general "theme" of its control over infrastructure.

We disagree. The task of harmonizing contracts entails reconciling otherwise conflicting contractual provisions. That task does not authorize courts to ensure that every provision comports with some grander theme or purpose, particularly when the parties have not said in the contract which purpose matters most or that everything else in the contract should be read subject to that purpose.[3] To hold otherwise would implicitly assume that contracting parties pursue a purpose (at whatever generality) at all costs. That proposition is as foreign to the contractual process as it is to the legislative one, *see, e.g.*, *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86-87 (Tex. 2017), especially where, as here, two sophisticated parties negotiate a business deal.

---

[3] In its most relevant and legal sense, "context" is simply the surrounding words and structure of the operative text. *See Context*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The surrounding text of a word or passage, used to determine the meaning of a word or passage."); *see also Brown*, 660 S.W.3d at 754 ("Among the core contextual considerations that generate reliable constructions are the surrounding provisions of a disputed text . . . ."). Texas Central's alternative and broader meaning of context would smuggle in the many extratextual, extrinsic, and subjective considerations that we have long rejected in contract interpretation. *Cf. Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199-200 (1993) (rejecting "the broader sense" of context that includes "[a]ssociated surroundings" and "legislative history") (alteration in original); Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 168 (2012) ("It is not a proper use of the [whole-text] canon to say that since the overall purpose of the statute is to achieve *x*, any interpretation of the text that limits the achieving of *x* must be disfavored.").

Texas Central also argues that its reading of Section 1.1(3) is the only reading that gives the "in writing" requirement any effect. The "including without limitation" language does not place any limit on what may constitute "various concrete and ground surface improvements," Texas Central reasons, so if the "in writing" requirement applied only to the last component of the serial list ("other items"), it would not serve any purpose. Again, we disagree. Texas Central is right that use of the word "including" before a list presumptively indicates that the list is nonexhaustive. But nonexhaustive hardly means indefinite. Texas Central's stated concern—that Polyco would have a "blank check" to build improvements of no use in Texas Central's railroad operations unless the "in writing" requirement applies to everything in Section 1.1(3)—is accounted for by the reading that we (and the lower courts) have embraced. The items listed after "including" and shown generally in the exhibit are those that both parties already "agreed to" with the general provisions on which Texas Central relies, while unenumerated items require further agreements: "and other items in or adjacent to the Designated Areas as are agreed upon by [Texas Central] and [Polyco] in writing." It is not terribly surprising for parties to agree to a delegation of authority for known and anticipated items while requiring further consultation for "other items" that they have not yet imagined.[4]

---

[4] Relatedly, Texas Central contends that having the writing requirement apply to everything listed in Section 1.1(3) makes good sense when considered along with the fact that Exhibit X mentioned in Section 1.1 is a *Preliminary Layout*"—that is, the parties could have *generally* agreed to infrastructure items but required a written agreement when it came down to specifics. This argument, however, proves too much. The "Preliminary Layout" precedes not

\* \* \*

We therefore hold that the phrase "as are agreed upon by [Texas Central] and [Polyco] in writing" in Section 1.1(3) of the Railroad Allowance Agreement modifies only the phrase "other items in or adjacent to the Designated Areas," not everything else listed in that subsection. The trial court correctly construed this provision, and the court of appeals erred in holding that it was ambiguous. Because of the latter court's holding, however, it had no opportunity to address Texas Central's other arguments, including those it raised with respect to the Transload Agreement. The court of appeals should address those issues in the first instance on remand. *See In re Troy S. Poe Tr.*, 646 S.W.3d 771, 780-81 (Tex. 2022). Without hearing oral argument, we grant the petition for review, reverse the court of appeals' judgment, and remand the case to that court for further proceedings. *See* TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** November 3, 2023

---

only Section 1.1(3) but Sections 1.1(1) and 1.1(2) as well, and Texas Central does not (and could not) go as far as to say that the "in writing" requirement reaches beyond Section 1.1(3).

14