**Opinion issued March 14, 2024**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-22-00417-CV

———————————

**FIVE STAR ELECTRIC MOTORS, INC., Appellant**

**V.**

**THOMAS PATLOVANY, Appellee**

---

**On Appeal from the 113th District Court
Harris County, Texas
Trial Court Case No. 2019-32822**

---

### MEMORANDUM OPINION

After resigning his position, Thomas Patlovany sued his former employer, Five Star Electric Motors, Inc., for breach of contract and quantum meruit, alleging that the company refused to pay him the compensation he is owed for sales made before he resigned. After a bench trial, the trial court rendered a judgment awarding

Patlovany $749,906.02 in damages, pre- and post-judgment interest, and costs. Five Star Electric Motors appeals from the trial court's judgment, which we affirm.

## BACKGROUND

Five Star Electric Motors is a manufacturer's representative. As relevant here, it acted as an agent of Siemens, representing that manufacturer in sales to customers. Because these sales entailed the design and manufacture of equipment to meet the specific requirements of a given customer, completion of one of these transactions generally took some time after the initial sale was made—anywhere from three months to a year. During this time, Five Star Electric Motors essentially acted as a liaison between Siemens and the customer, shepherding the transaction toward its completion and attempting to secure future sales in the process. The customer paid Siemens for the equipment, and Siemens, in turn, paid Five Star Electric Motors part of the sales price as a commission for its role in making and finalizing the sale.

From August 2012 through December 2018, Patlovany was an account manager or salesman employed by Five Star Electric Motors to represent Siemens.

Patlovany and Five Star Electric Motors executed a two-page employment agreement in August 2012. He was hired as the Senior Director of Major Products reporting to Patrick McGinty, the Vice President of Sales and Marketing. The employment agreement stated that Patlovany was an at-will employee, and specified his compensation as follows: "Compensation for you will be a base salary of

2

$160,000 per year. Total annual compensation will be the greater of your base salary at $160,000 or 35% of the net profit received on your accounts and project sales."

The parties' dispute centers on whether Patlovany is entitled to the "35% of the net profit received on" his "accounts and project sales" for sales made before his resignation even though the profit was not received by Five Star Electric Motors until afterward. The employment agreement does not expressly address this issue. It states only that Patlovany is an at-will employee and that he or the company can end his employment at any time without notice or cause. The employment agreement does not address what effect the end of his employment may have on compensation relating to sales made beforehand when the profit had not yet been received.

At trial, Patlovany testified that he was paid monthly, specifying that he was paid a prorated amount of his annual salary of $160,000 each month and then would be credited the additional 35%, if earned through his sales, the following month. This payment arrangement changed in April 2018, when Siemens altered how it paid Five Star Electric Motors, and Five Star Electric Motors, in turn, altered how it paid Patlovany. According to Patlovany, under the new payment arrangement, he no longer received the additional 35% the month after he made the sales at issue. It is not that Patlovany would no longer receive the 35% when applicable under the new arrangement; rather, Patlovany would no longer receive payment as promptly.

3

Patlovany objected to the delay in payment. He and Five Star Electric Motors tried to resolve this issue about the timing of the payment over the course of several months. When they could not do so, he resigned effective December 31, 2018.

After Patlovany resigned, Five Star Electric Motors declined to pay Patlovany any of the payments that had been delayed. In an e-mail from McGinty to Patlovany, McGinty wrote that Patlovany "forfeited" these "commissions" when he resigned. Patlovany testified that he was owed $749,906.02 for "orders placed in 2018." He stated he was seeking only the 35% he was due for sales made before he resigned.

Patrick McGinty, the corporate representative of Five Star Electric Motors, testified about the manner in which the company was compensated for sales by Siemens. According to McGinty, before Siemens altered payment arrangements in 2018, Siemens generally paid Five Star Electric Motors when the sale was final and the customer received the equipment, which was when Siemens itself received payment from the customer. McGinty said this is the customary industry practice.

But McGinty testified that Siemens also sometimes made progress payments to Five Star Electric Motors, specifically in transactions in which the customer paid Siemens for the fulfillment of various project milestones, like the approval of a design. These progress payments represented some percentage of the overall sales price. Less than one in five of the sales of Siemens's equipment involved progress payments. In all other cases, Siemens paid only on completion of the transaction.

4

Siemens alone decided how a given sales transaction was structured. Five Star Electric Motors had no say as to when Siemens would be paid by the customer.

The dispute between Five Star Electric Motors and Patlovany arose when Siemens changed its usual method of payment by paying about half of the commission it owed to Five Star Electric Motors at or near the time of the initial sale and unconnected to any sort of project milestone. From April 2018 onward, all Siemens-related transactions were structured in this two-payment manner, with one half of the commission paid upfront and the remaining half paid on completion. Based on this change, McGinty testified, Five Star Electric Motors regarded the first payment as unearned income when the company received it because no work had yet been undertaken, and if the project was changed or canceled for whatever reason, Five Star Electric Motors would then have to refund the payment to Siemens.

As a result, Five Star Electric Motors contended that its account managers or salesmen, like Patlovany, could no longer be paid the additional 35%, when earned, the month after the company received payment from Siemens. Instead, account salesmen or managers would receive any 35% commission they earned when a given sales transaction had been finalized and Five Star Electric Motors had received all payment due from Siemens in connection with a particular sale. Patlovany objected to this delay in the payment of commissions for sales made but not yet finalized.

McGinty testified that after Patlovany resigned, he was no longer entitled to any compensation—including any 35% commission on sales already made—under the employment agreement. Had Patlovany not resigned and remained an employee of Five Star Electric Motors, McGinty stated Patlovany would have received the 35% commission owed on the sales he made that are at issue in this litigation once Siemens had fully paid Five Star Electric Motors for the applicable transactions.

The essence of McGinty's testimony was that the company's employment agreement with Patlovany provided for the payment of commissions based on "the net profit received" on his "accounts and project sales" and the company had not received any net profit based on the sales at issue while Patlovany remained an employee. This is so because Siemens had not made the final payment due to Five Star Electric Motors on these sales when Patlovany resigned, and even with respect to upfront payments that Siemens had made, these remained unearned income that Five Star Electric Motors could have had to refund, not "net profit received."

McGinty did not dispute that Siemens eventually paid all amounts due based on Patlovany's sales. Five Star Electric Motors made no refunds to Siemens.

Two other witnesses testified: Oran J. Tsakopulos, the outside accountant for Five Star Electric Motors, and Rigoberto D'Leon, its controller. Both testified about the company's accounting practices, unearned income versus profit, and Siemens's payments. In general, their testimony on these topics corroborated McGinty's.

6

After hearing the evidence, the trial court rendered judgment for Patlovany, awarding him $749,906.03 in actual damages—the amount of commissions he alleged he was owed—as well as pre- and post-judgment interest and costs.

## DISCUSSION

Five Star Electric Motors appeals from the trial court's judgment on several grounds. Its first issue—whether Patlovany is entitled to the commissions for which he sued under the correct interpretation of the parties' contract—is dispositive.

### Standard of Review and Applicable Law

Both sides contend the two-page employment agreement is unambiguous, and we agree that the agreement's language is susceptible to only one reasonable interpretation. As the interpretation of an unambiguous contract presents a question of law, our review is de novo. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018) (reciting that whether contract is ambiguous and proper interpretation of unambiguous contract are both questions of law that are reviewed de novo).

When a contract is unambiguous, we endeavor to ascertain and give effect to the parties' intent as expressed in its written terms, which we interpret according to their plain, ordinary, and generally accepted meaning unless the contract directs otherwise. *Id.* at 763–64. We do not consider what the parties claim they intended to say but did not. *Id.* Nor may the parties introduce extrinsic evidence to give the contract a different meaning than the contract's written terms convey. *Id.* at 764.

7

In *Perthuis v. Baylor Miraca Genetics Laboratories*, our Supreme Court instructed how contracts involving commissions are to be interpreted in light of the law on sales and the procuring-cause doctrine. 645 S.W.3d 228 (Tex. 2022).

The procuring-cause doctrine provides that a salesperson or other agent who contracts for a commission becomes entitled to payment of the commission when through his efforts he produces a buyer who is ready, able, and willing to buy that which is being sold. *Id.* at 234. That is, the right to the commission "vests on his having procured the sale, not on his actual involvement in a sale's execution or continued employment through the final consummation of the sale." *Id.* at 234–35. This is a rule of fairness, ensuring that those who contractually commit to pay a commission cannot render this commitment a dead letter by accepting the performance of a salesperson or other agent and then avoiding payment by terminating the salesperson or other agent before the consummation of the sale or through similar devices. *Id.*; *Goodwin v. Gunter*, 185 S.W. 295, 296 (Tex. 1916).

The procuring-cause doctrine is "a default rule." *Perthuis*, 645 S.W.3d at 234–37. Contracting parties may displace this default rule and condition the receipt of commissions on terms they find mutually satisfactory. *Id.* at 235–37. But to displace the doctrine, the parties must "say so" in the contract. *Id.* at 235. As a default rule applicable absent a statement to the contrary, the procuring-cause doctrine reinforces ordinary rules of contract interpretation by ensuring parties cannot rewrite

8

contractual terms about commissions after execution "by adding exceptions under the guise of ambiguity." *Id.* If the contract does not expressly limit the circumstances under which commissions are due under the default rule established by the procuring-cause doctrine, the contract is unambiguous and "courts will not indulge a party's effort to smuggle in limitations on commission payments that parties could have, but did not, textually express." *Id.* at 236. "[I]t is unreasonable as a matter of law to allow for such an exception when the contract is silent." *Id.* at 240.

To displace the procuring-cause doctrine, parties need not use particular "magic language." *Id.* at 237. They need only use "terms that are inconsistent with the default rule—which is to say, terms that in some way cabin the textually imposed contractual obligation to pay a commission." *Id.* For example, a "contract could deny the payment of commissions from procured sales absent continued employment; authorize commissions only on sales that close during the employment or brokerage relationship; condition commissions on the money from the sale being received within a particular time frame; provide a time limit after termination beyond which commissions from procured sales will not be paid; or include a myriad of other terms that could displace the procuring-cause doctrine in whole or in part." *Id.*

## Analysis

The first step in analyzing the interplay between the procuring-cause doctrine and a given contract is to determine whether the contract is the kind to which the

9

doctrine generally will apply. *Id.* at 234. If the contract contains "an agreement to pay a commission on a sale," then the doctrine generally is applicable. *Id.*

Here, the employment agreement does not use the word "commission." Nonetheless, on its face, the agreement provides for the payment of commissions. A commission includes any "fee paid to an agent or employee for a particular transaction." *Commission*, BLACK'S LAW DICTIONARY (11th ed. 2019). Usually, this fee consists of "a percentage of the money received from the transaction." *Id.* Under the agreement, Patlovany was entitled to be compensated "the greater of [his] base salary at $160,000 or 35% of the net profit received on [his] accounts and project sales." That the agreement guaranteed Patlovany a base salary does not alter the character of the "35% of the net profit received" as a commission on sales. *See Perthuis*, 645 S.W.3d at 232, 239 (holding contract that provided "annual base salary" plus commission on "net sales" was kind to which procuring-cause doctrine applied).

Thus, we proceed to the second step of the required analysis, in which we must determine whether the parties displaced the procuring-cause doctrine in the employment agreement. *Id.* at 234, 237. The agreement does not include any express terms that purport to limit Patlovany's right to commissions on procured sales. The agreement does state his employment relationship with Five Star Electric Motors was at-will and could be ended by either party at any time without notice or cause.

10

But at-will employment, in and of itself, does not displace the procuring-cause doctrine. *Id.* at 238. And the agreement is silent as to how termination or resignation might affect Patlovany's entitlement to commissions on procured sales. Therefore, the parties did not displace the procuring-cause doctrine. *Id.* at 235–37, 240.

This brings us to the third and final step of the required analysis, which asks whether the evidence shows Patlovany was the procuring cause of the sales at issue, such that he is entitled to the specific commissions he seeks. *Id.* at 234, 241.

Five Star Electric Motors does not dispute that Patlovany was the procuring cause of the sales at issue. At trial, its position was that he would have been entitled to all the commissions he sought had he not resigned. As the company's counsel stated in opening statement, "All Mr. Patlovany had to do to get the money he's asking for was stay employed by the company; he would have gotten every dime."

Hence, consistent with the trial court's judgment, we hold that Patlovany is entitled to recover the commissions he sought under the employment agreement.

On appeal, Five Star Electric Motors tries to avoid this holding in various ways. It argues that the contract's characterization of Patlovany's commissions as part of his "annual compensation" displaces the procuring-cause doctrine. The company essentially reasons that no employee is entitled to continue receiving compensation from his employer after the employment relationship ends. Thus, when Patlovany resigned, he gave up the right to commissions on procured sales.

11

This position, however, inverts the procuring-cause doctrine. The doctrine provides that, absent an express contractual term to the contrary, the entitlement to a commission vests when a salesperson or other agent procures the sale and does not depend on his "continued employment through the final consummation of the sale." *Id.* at 234–35. In *Perthuis*, the employer similarly contractually agreed to provide its at-will employee with "an annual base salary" and commissions based on his "net sales." *Id.* at 232. The employer then sought to avoid paying commissions on sales that the employee procured before his termination but that were not finalized beforehand. *Id.* at 232–33. Because the contract was silent as to what became of commissions on sales procured before termination, the Supreme Court rejected the employer's attempt to avoid paying commissions on these sales. *Id.* at 237–41.

In the same vein, Five Star Electric Motors argues that Patlovany was contractually entitled to commissions of "35% of the net profit received on [his] accounts and projects sales," but that he cannot recover the ones he seeks because the company did not receive a net profit on these sales before his resignation due to the way in which Siemens paid the company. But Five Star Electric Motors did not dispute at trial that it eventually received net profits on all the sales in question, albeit after Patlovany was no longer an employee. As the Supreme Court noted in *Perthuis*, parties are free to contract to "authorize commissions only on sales that close during the employment or brokerage relationship" or "condition commissions on the money

12

from the sale being received within a particular time frame." *Id.* at 237. But the contract must expressly say so, and limitations or exceptions of this kind regarding commissions on procured sales cannot be inferred from silence on the issue. *Id.*

Five Star Electric Motors additionally argues that the evidence at trial shows that Patlovany's commissions were based and conditioned on shepherding the sales transaction between Siemens and its customer to conclusion, not just the initial sale. The employment agreement, however, states otherwise. It provides for commissions of "35% of the net profit received on [Patlovany's] accounts and project sales." On its face, the agreement does not limit commissions on procured sales to situations in which Patlovany continued to shepherd the transaction through completion. At trial, McGinty conceded that the employment agreement does not limit commissions in this way. And, contrary to Five Star Electric Motors' argument, we cannot consider extrinsic evidence, like testimony, to impose an unstated limitation or exception on these commissions. *See id.* at 236 n.9 (rejecting proposition that extrinsic evidence may be used to prove limitation on commission obligation not included in contract).

In sum, *Perthuis* disposes of the arguments advanced by Five Star Electric Motors to avoid liability for commissions under the employment agreement.

Finally, to the extent Five Star Electric Motors contends on appeal that the parties' modified the employment agreement's commissions obligation, its position in the trial court was to the contrary. Its counsel represented to the trial court that the

parties' dispute concerned the meaning of the signed employment agreement and that the company was "not even contending that the contract's changed." Consistent with this representation, McGinty testified that there "was no change in the commission process" and the company was "adhering to the contract" Patlovany "signed." Accordingly, Five Star Electric Motors cannot argue for contract modification on appeal because it is "restricted on appeal to the theory on which the case was tried." *Wells Fargo Bank v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015).

In any event, even if Five Star Electric Motors could advance this issue on appeal, the purported contract modification concerns when the company became obligated to pay Patlovany for commissions on sales he procured, not whether the company remained obligated to pay the commissions if he resigned after procuring these sales. In other words, like the unmodified employment agreement, the purported modification does not expressly displace the procuring-cause doctrine.

Because the signed employment agreement is dispositive, we need not address the other issues raised by the parties on appeal, including whether Patlovany could also recover the damages the trial court awarded to him on a theory of quantum meruit. *See* TEX. R. APP. P. 47.1 (requiring courts of appeal to issue written opinions that are as brief as practicable but address all issues necessary to final disposition).

## CONCLUSION

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Countiss, and Farris.