# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-24-00334-CV

**Blackmon Mooring of Austin, LLC, Appellant**

**v.**

**St. Edward's University, Inc., Appellee**

FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-18-001472, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

## MEMORANDUM OPINION

This is an appeal from a summary judgment dismissing a claim for breach of contract. After a burst pipe flooded one of its on-campus student dormitories, St. Edward's University, Inc. (SEU) retained Blackmon Mooring of Austin, LLC to mitigate the damage and rebuild portions of the dorm. The parties entered into a Reconstruction Contract, which provided that SEU would pay Blackmon Mooring on a cost-plus basis with no guaranteed maximum price. The Scope of Work attached to the Reconstruction Contract established an "estimated budgetary price" for the work, which Blackmon Mooring could "exceed" with "notice" to SEU and its casualty insurer, Federal Insurance Company.

As the work progressed, Blackmon Mooring notified SEU and Federal that it would be exceeding the estimated budget, though it did not say by how much. Neither SEU nor Federal objected. Both emphasized the importance of Blackmon Mooring completing the work

as soon as possible. Blackmon Mooring completed the work as instructed, but when it sought final payment in an amount far exceeding the estimated budget, SEU refused to pay the total amount invoiced.

Blackmon Mooring sued SEU for breach of contract to recover the unpaid balance, and SEU moved for summary judgment. Relying largely on the parties' negotiations and contemporaneous communications, SEU argued that the "estimated budgetary price" was a "not-to-exceed" number that set a ceiling on SEU's contractual obligation absent a written Modification to the Reconstruction Contract. Because the parties never amended the Reconstruction Contract to increase the amount of the estimated budget, and because Blackmon Mooring had already been paid an amount exceeding the estimated budget, SEU argued that the summary-judgment evidence established that SEU had fully satisfied its contractual obligations and that there was no breach of contract as a matter of law. The trial court agreed, granted SEU's motion, and dismissed Blackmon Mooring's claim for breach of contract.

We hold that the Reconstruction Contract unambiguously requires that SEU pay Blackmon Mooring on a cost-plus basis with no guaranteed maximum price; that the estimated budget is an estimate that can be exceeded with notice (as opposed to a written Modification); and that, in holding otherwise, the trial court improperly relied on inadmissible parol evidence that varies, adds to, and contradicts the plain meaning of the contract's unambiguous text. Accordingly, we reverse the trial court's summary judgment and remand for further proceedings consistent with our opinion.

2

## BACKGROUND

In November 2018, a large chilled-water pipe burst at the Pavilions dorm on SEU's campus, flooding the building and rendering it uninhabitable. SEU notified Federal of the covered flood event and retained Blackmon Mooring to mitigate the flood damage and rebuild the dorm. This appeal concerns Blackmon Mooring's latter reconstruction work, which it performed under a Reconstruction Contract.

### *Blackmon Mooring and SEU sign the Reconstruction Contract*

The parties and Federal engaged in extensive negotiations before signing the Reconstruction Contract on February 1, 2019. The fully integrated instrument consists of two principal "Contract Documents": (1) the base Contract and (2) an attached Scope of Work.

Under Article 1 of the Contract, Blackmon Mooring agreed to "execute the Work described in the Contract Documents," including the Scope of Work. The Scope of Work, in turn, listed fifteen broad categories of "structural" work that Blackmon Mooring would complete to restore the Pavilions dorm to a "pre-water damaged condition."

Under Article 3 of the Contract, SEU agreed to pay Blackmon Mooring the "Contract Sum" for Blackmon Mooring's "performance of the Contract." The "Contract Sum" was defined in Section 3.1, which allowed the parties to select one of three options:

> (1) "Stipulated Sum," which would set a fixed, total price for the Work and thereby place the risk of cost overruns on Blackmon Mooring;
>
> (2) "Combined Time & Material basis and Cost of the Work plus the Contractor's Fee, in accordance with Contractor's Scope of Work, attached as Exhibit A," a cost-plus-fee arrangement that would establish a formula for calculating the price without setting a cap and thereby place the risk of cost overruns on SEU; or
>
> (3) "Cost of the Work plus the Contractor's Fee with a Guaranteed Maximum Price," a cost-plus-fee arrangement that would establish a formula for calculating the

3

price while setting a cap and thereby shift the risk of cost overruns exceeding the cap to Blackmon Mooring.

The parties selected the second option for the Contract Sum, according to which Blackmon Mooring would be paid on a cost-plus basis with no guaranteed maximum price. The parties thus rejected a stipulated sum or guaranteed maximum price for the Contract Sum.[1]

Consistent with Article 3, the Scope of Work, attached to the Reconstruction Contract as Exhibit A, in a section titled "Pricing," provided that Blackmon Mooring would be paid on a cost-plus basis: "This reconstruction service will be performed on a combined Time & Material basis and Cost of the Work Plus Contractor's Fees basis, as outlined below." Like other cost-plus contracts, the Scope of Work provided rate schedules for labor, equipment, and materials. The Scope of Work also included an "estimated budgetary price" of just over $4 million and provided that all parties would be "notified ASAP" if at any point that "budgetary number" was "going to be exceeded":

> The estimated budgetary price for the work and services as outlined in this scope will be **$4,043,303**[]. If at any time the budgetary number is going to be exceeded, all parties will be notified ASAP.

Under Article 6 of the Contract, the parties agreed that the Reconstruction Contract was a fully integrated agreement that could only be amended by Modification:

---

[1] The other sections of Article 3 further reflected that the parties rejected a "Stipulated Sum" or "Guaranteed Maximum Price" for the Contract Sum. For Section 3.2, the section for establishing the basis for a "Stipulated Sum," and for Section 3.4, the section for establishing the "Contractor's Fee with a Guaranteed Maximum Price," the parties marked "N/A" and left the remainder of the sections blank. For Section 3.3, the section for establishing the Contractor's Fee under the second payment option, the parties agreed to a fee of 20% of the Cost of the Work.

> The Contract Documents form the Contract for construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification.

"Modification" was defined as "a written amendment to the Contract signed by both parties."

***Blackmon Mooring notifies SEU and Federal that it will exceed the estimated budget***

After the parties signed the Reconstruction Contract, Blackmon Mooring began rebuilding the dorm. In February, Blackmon Mooring invoiced SEU for $1,010,825.75. Then, in late March, Blackmon Mooring an additional $2,313,690.50 to SEU.

Blackmon Mooring Regional Director Chris Matthews emailed the March invoice to SEU Assistant Vice President of Operations Jim Morris and Federal Executive General Adjuster Mike Koos. In the email, Matthews discussed Blackmon Mooring's progress on the third floor and two common areas. It was important to SEU that these parts of the dorm be completed by April 16 so that SEU could show them to students before signing leases for the upcoming year. Matthews wrote that Blackmon Mooring was "rounding the last curve" and had "the finish line in sight" but that he had "two concerns" about "completing the project" in time. One of his concerns was that Blackmon Mooring's services were approaching the estimated budget and would, "when completed," exceed it: "As you can see in the invoice we are getting close to the negotiated figure provided and when completed we will be over the 4 [million]." His other concern was about approving certain subcontractors for overtime to "expedite the project": "All sub-contractors are working 7-3 M-F and it will expedite the project if we can get OT approved for the Electrical and HVAC work."

Morris responded to Matthews's email by emphasizing the importance of completing the project on time and avoiding delays in approving the overtime:

> I'll throw in my input and emphasize that whatever we can do to get things substantially complete on the 3rd floor, multi-purpose room, and lobby in the next few weeks will be crucial as we will be taking the students through the building during the time that they sign up for residences next year (walkthrough is scheduled for 4/16 from 4-6pm). If we can avoid delays in any further reasonable approvals needed, that would help. The last snag put us a few weeks behind and I'd like to avoid that.

Koos responded by asking how much the overtime would cost and explaining how it would be approved under the policy:

> Do you have a range of what the additional cost for the OT will be? We would need to be able to separate out the OT costs so this can considered under the Extra Expense coverage portion of the policy, if needed. We want to do everything possible to meet the deadline. We just need to know the potential $$ range.

Neither Morris nor Koos directly responded to Matthews's concern about exceeding the estimated budget. But it is undisputed that they understood Matthews to be advising them that Blackmon Mooring would soon exceed it. And it is undisputed that neither SEU nor Federal objected to Blackmon Mooring doing so.

### *Blackmon Mooring completes the Work to SEU's satisfaction*

After Matthews's March email, Blackmon Mooring's work continued for months, and Blackmon Mooring's progress was closely monitored. SEU held regular progress meetings with representatives from Blackmon Mooring and Loss Maintenance Services, a consultant Federal had retained to oversee the claim and costs. SEU circulated agendas summarizing Blackmon Mooring's work and progress, and Blackmon Mooring circulated daily updates.

In July, Blackmon Mooring invoiced SEU for an additional $3,950,047.88. SEU did not object that Blackmon Mooring had far exceeded the estimated budget or order Blackmon Mooring to stop working. In August, Blackmon Mooring completed all major work, ensuring the dorm was ready for full occupancy for the fall semester. Morris emailed Blackmon Mooring Construction Project Manager Ray Tamez to thank him for dealing with various "curveballs" in the last few weeks and for putting in "long hours" to get the dorm "right" for SEU's staff and students. Finally, in September, Morris signed a Statement of Work Complete, agreeing that "[a]ll work ha[d] been completed to [his] satisfaction and complie[d] with the requirements of the Contract in all respects."

**SEU refuses to pay the total amount invoiced**

For the Work performed under the Reconstruction Contract, Blackmon Mooring invoiced SEU a total of $8,866,842.45. Of that, SEU and Federal paid $5,242,125.23—an amount exceeding the estimated budget, but still $3,624,717.22 less than the amount invoiced. When Blackmon Mooring made demand for the unpaid balance, SEU and Federal took the position that the estimated budget in the Scope of Work set a guaranteed maximum price that could not be exceeded without a Modification to the Reconstruction Contract.

**Blackmon Mooring files suit to recover the unpaid balance**

In May 2020, Blackmon Mooring sued SEU for breach of contract.[2] Blackmon Mooring alleged that SEU agreed to pay Blackmon Mooring on a cost-plus basis with no guaranteed maximum price. Blackmon Mooring further alleged that, while the contract had

---

[2] Blackmon Mooring asserted various other claims, all of which were either dismissed or settled.

included an estimated budget, that budget could be exceeded with notice, which Blackmon Mooring had provided. SEU denied liability, asserted a declaratory-judgment action seeking, among other things, a declaration that the Reconstruction Contract "unambiguously contains a not-to-exceed amount," and asserted an alternative third-party coverage and indemnity claim against Federal.

***The trial court grants summary judgment to SEU and dismisses Blackmon Mooring's claim for breach of contract***

SEU moved for partial summary judgment on Blackmon Mooring's breach-of-contract claim, arguing that the "estimated budgetary price" was an "agreed-upon" Contract Sum that could be exceeded only with a written Modification to the Reconstruction Contract. SEU based its argument largely on evidence of the parties' negotiations and communications extrinsic to and predating the Reconstruction Contract. In its response, Blackmon Mooring argued that the Reconstruction Contract "unambiguously and intentionally exclude[d] a not-to-exceed amount" by rejecting a "guaranteed maximum amount" and adopting an "estimated budgetary price" option that could be exceed "upon notice." Blackmon Mooring further argued that evidence of the parties' negotiations and communications constituted improper parol evidence and could not be considered in construing the Reconstruction Contract's unambiguous text.

The trial court agreed with SEU, granted SEU's motion, and ordered that Blackmon Mooring take nothing on its breach-of-contract claim.[3] The parties then filed a joint notice of nonsuit that nonsuited Blackmon Mooring's remaining claims and SEU's declaratory-judgment action. The trial court signed a final order memorializing the nonsuit, thereby rendering the partial-summary-judgment order final. Blackmon Mooring now appeals.

---

[3] This ruling mooted SEU's alternative coverage claim against Federal.

**SUMMARY JUDGMENT**

On appeal, Blackmon Mooring contends that the trial court erred in granting summary judgment for SEU and dismissing Blackmon Mooring's claim for breach of the Reconstruction Contract. Blackmon Mooring contends that the trial court's summary judgment is based on an erroneous interpretation of the Reconstruction Contract—one that erroneously construes the estimated budget in the Scope of Work as establishing a guaranteed maximum price that could not be exceeded without a written Modification to Reconstruction Contract. Blackmon Mooring contends that the Reconstruction Contract unambiguously requires SEU to pay Blackmon Mooring on a cost-plus basis with no guaranteed maximum price and that the estimated budget in the Scope of Work was just an *estimate* that could be exceeded with notice. Blackmon Mooring contends that the contrary interpretation advanced by SEU and adopted by the trial court conflicts with the plain meaning of the text and improperly relies on parol evidence to vary, alter, and add to the contract's terms.

SEU responds that the estimated budget was a negotiated price cap that could not be exceeded without a written Modification to the Reconstruction Contract and that the parties' negotiations and contemporaneous communications constitute appropriate contextual evidence shedding light on the meaning of the text of the contract.

## I. Law

While the parties advance conflicting interpretations of the Reconstruction Contract, they agree that the contract is unambiguous. However, a contract may be ambiguous even though the parties agree that it is not. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). Both the presence of ambiguity and the interpretation of an unambiguous

9

contract are questions of law, which we review de novo using well-settled rules of contract construction. *Id.*

When a contract's meaning is disputed, our primary objective is to ascertain the parties' intent as expressed in the contract itself. *Id.* To do so, we consider the contract's language, structure, and context. *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 388 (Tex. 2023) (per curiam). For context, we may consider objectively determinable facts and circumstances that inform the contract's text. *URI, Inc.*, 543 S.W.3d at 758, 768 (objectively determinable facts and circumstances may include "the commercial or other setting in which the contract was negotiated," "trade custom," and "trade usage"). We may not, however, consider surrounding facts and circumstances that vary, add to, or contradict the contract's text. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483–84 (Tex. 2019) (parol-evidence rule barred consideration of evidence of parties' "substantive negotiations" and "prior drafts" of agreement). This latter type of contextual evidence is barred by the parol-evidence rule. *Id.* at 483.

If we determine that the contract is subject to only one reasonable interpretation, then the contract is unambiguous, and we construe it as a matter of law. *Id.* at 479. But if we determine that the contract is subject to two or more reasonable interpretations, then the contract is ambiguous, and the parties may introduce parol evidence to shed light on its meaning, which becomes a question of fact for the jury. *Id.* at 480.

## II. Analysis

Applying the pertinent rules of construction to the contract's language, structure, and context, we hold that the Reconstruction Contract is unambiguous, and we construe it as a

matter of law. In construing the contract, we hold that it requires that SEU pay Blackmon Mooring on a cost-plus basis without imposing a guaranteed maximum price. We further hold that a Modification to the Reconstruction Contract is not required to exceed the estimated budget in the Scope of Work. Instead, the Scope of Work plainly and unambiguously provides that the estimated budget may be exceeded with notice. Finally, we hold that evidence of the parties' negotiations and other communications predating the Reconstruction Contract is inadmissible parol evidence that cannot be considered in construing the parties' agreement and that the trial court erred in considering such evidence here.

## A. The Reconstruction Contract unambiguously requires that SEU pay Blackmon Mooring on a cost-plus basis with no guaranteed maximum price.

Under Article 3 of the Reconstruction Contract, SEU agreed to pay Blackmon Mooring the "Contract Sum." For the "Contract Sum," the parties could select one of three options: (1) "Stipulated Sum," (2) "Combined Time & Material basis and Cost of the Work plus the Contractor's Fee, in accordance with Contractor's Scope of Work," or (3) "Cost of the Work plus the Contractor's Fee with a Guaranteed Maximum Price."

Option one, as the name suggests, is for a stipulated or fixed amount. Options two and three are for indeterminate amounts—they are different versions of what is commonly known as a cost-plus contract:

> Under this method of contracting, the owner agrees to pay the contractor for costs incurred in completing the work, plus a percentage of the cost of construction or a fixed amount as a fee. This arrangement provides the general contractor with a measure of protection on projects where it is not possible to tell what work must be performed and on projects where many changes are anticipated at the outset of construction.

11

Joe F. Canterbury, Jr. & Brad W. Gaswirth, *Texas Construction Law Manual* § 5:4 (3d ed. 2023); *see also Garza v. Cantu*, 431 S.W.3d 96, 100 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("In so-called cost-plus contracts like this one, the contractor is to be reimbursed for costs of materials and labor by the owner and is to receive a stated percentage of such costs as his profit."); *Cost-plus contract*, Black's Law Dictionary (12th ed. 2024) ("A contract in which payment is based on a fixed fee or a percentage added to the actual cost incurred; esp., a construction contract in which the owner pays to the builder the actual costs of material and labor plus a fixed percentage over that amount.").

Under a traditional cost-plus contract, the owner assumes the risk of cost overruns. For this reason, "an owner will often insist that the cost-plus contract be accompanied by a maximum guaranteed cost provision so as to allocate to the contractor some of the risks of increased costs and cap the owner's construction costs." Canterbury & Gaswirth, *Texas Construction Law Manual* § 5:4. A popular form for doing so describes the "Contract Sum" as "the Cost of the Work Plus a Fee with a Guaranteed Maximum Price." *Id.*

Here, the second option does not include a guaranteed maximum price, but the third option does. This distinction is important. It means that while both cost-plus options are for indeterminate amounts, only costs under the third option are limited by a guarantee maximum price. *Compare Stonehill-PRM WC I, L.P. v. Chasco Constructors, Ltd.*, No. 03-08-00494-CV, 2009 WL 349136, at *1 & n.2 (Tex. App.—Austin Feb. 11, 2009, no pet.) (mem. op.) (cost-plus contract imposed guaranteed maximum price with following language: "The sum of the Cost of the Work and the Contractor's Fee is guaranteed by the Contractor not to exceed [amount set by addendum] subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed

Maximum Price."), *with Cobb v. Thomas*, 565 S.W.2d 281, 288 (Tex. App.—Tyler 1978, writ ref'd n.r.e.) (holding that cost-plus contract did not include guaranteed maximum price, even though parties "orally negotiated" one, where "no provision in the contract provid[ed] for a cost limitation or maximum cost at which the house was to be constructed"). In other words, the Contract Sum under the second option is both unfixed and uncapped, while the Contract Sum under the third option is unfixed but capped.

The parties selected the second option for the Contract Sum, according to which Blackmon Mooring would be paid on a cost-plus basis. And by selecting the second option, they necessarily rejected the first and third options—that is, they rejected a stipulated sum or guaranteed maximum price for the Contract Sum. We hold that the Reconstruction Contract unambiguously requires that SEU pay Blackmon Mooring on cost-plus basis with no guaranteed maximum price and in accordance with the Scope of Work.

**B. The Reconstruction Contract unambiguously requires notice—not a Modification—to exceed the "estimated budgetary price" in the Scope of Work.**

The Scope of Work confirms that SEU will pay Blackmon Mooring on a cost-plus basis: "This reconstruction service will be performed on a combined Time & Material basis and Cost of the Work Plus Contractor's Fees basis, as outlined below." It provides rate schedules for labor, equipment, and materials. It includes an "estimated budgetary price" of just over $4 million. And, in the event the estimated budget is to be exceeded, it requires that all parties be notified: "If at any time the budgetary number is going to be exceeded, all parties will be notified ASAP."

13

The Reconstruction Contract's merger clause provided that the contract "represent[ed] the entire and integrated agreement between the parties . . . and supersede[d] prior negotiations, representations or agreements, either written or oral." Therefore, Article 3 and the Scope of Work determined the formula for calculating the Contract Sum.

SEU argues that the estimated budget in the Scope of Work *is* the Contract Sum because Article 3 provides that the Contract Sum will be determined "in accordance with" the Scope of Work. We disagree. As discussed, the cost of a cost-plus contract is necessarily indeterminate and depends, in part, on the builder's rate schedule. So, when Article 3 says that the Contract Sum will be determined "in accordance with the Contractor's Scope of Work," it means that the cost of Blackmon Mooring's "Time & Materials" will be calculated according to the rate schedule in the Scope of Work, not that the Contract Sum will necessarily equal the estimated budget.

SEU further contends that the estimated budget is a "not-to-exceed" price that requires a written Modification to exceed. Again, we disagree. That is not what the contract says.

The Scope of Work does not describe the estimated budget as a "not-to-exceed" price. Instead, it describes it as an estimate. In similar situations, courts have declined to interpret contractual estimates and approximations as establishing ceilings or limits. *See, e.g.*, *Gay v. Stratton*, 559 S.W.2d 131, 131–32 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.) (cost-plus construction contract did not establish guaranteed maximum price by including "a rough estimate of the costs of construction"); *Kiewit Offshore Servs., Ltd. v. Dresser-Rand Glob. Servs., Inc.*, 756 F. App'x 334, 335, 339–40 (5th Cir. 2018) (per curiam) (even though contract established "target estimate" of $27 million, paying party "assumed the risk" of actual costs

ballooning to $42 million "by failing to include a limiting, 'not-to-exceed' price in the contract"); *Syring-Workman, Inc. v. Colbert*, 532 S.W.2d 708, 710 (Tex. App.—Waco 1976, writ ref'd n.r.e.) (contract did not establish binding price ceiling by stating "approximate maximum cost," since "'approximately' contemplates the possibility of a reasonable variance between the stated figure and the final cost").

Nor does the Scope of Work require a Modification to exceed the estimated budget. Instead, it requires notice. Throughout the Contract, the parties specify the circumstances under which a Modification is necessary. For example, in Section 8.3.2, they specify that Blackmon Mooring "may make a substitution of materials only with the consent of [SEU], and in accordance with a Modification." And in Section 9.1, they specify that the parties may make changes to the Work "by appropriate Modification." The parties obviously knew how to specify when a Modification was necessary. It stands to reason that if the parties had intended to require a Modification to exceed the estimated budget, they would have said so. Instead, they required notice.

We hold that the estimated budget in the Scope of Work does not cap the Contract Sum or otherwise function as a "not-to-exceed" price. We further hold that a Modification to the Reconstruction Contract is not required to exceed the estimated budget in the Scope of Work. Instead, the Scope of Work plainly and unambiguously provides that the estimated budget may be exceeded with notice.

### C. SEU's contrary construction is inconsistent with the plain meaning of the text and improperly relies on parol evidence.

In urging its alternative interpretation of the Reconstruction Contract, SEU largely relies on evidence of the parties' negotiations and other pre-contract communications. In

particular, SEU relies on two communications in particular that it attached as evidence to its summary-judgment motion: (1) a short email exchange between SEU's in-house lawyer, Ashlyn Campos, and Blackmon Mooring's Regional Director (a non-lawyer), Chris Matthews, and (2) an unsigned draft of the Reconstruction Contract circulated by Federal and annotated with Federal's comments, which were not included in or otherwise a part of the final signed agreement. SEU contends that the email and annotated draft constitute objectively determinable facts and circumstances that inform the contract's text. *See URI, Inc.*, 543 S.W.3d at 758, 768. We disagree.

The email and draft are inconsistent with the Reconstruction Contract's merger clause, which provides that the contract "represents the entire and integrated agreement between the parties . . . and supersedes prior negotiations, representations or agreements, either written or oral." Moreover, the email and draft are precisely the type of extrinsic evidence excluded by the parol-evidence rule. *Barrow-Shaver Res. Co.*, 590 S.W.3d at 483–84 (parol-evidence rule barred consideration of evidence of parties' "substantive negotiations" and "prior drafts" of agreement). The email and draft show the parties' subjective, rather than objective, intent. And they are offered to vary, add to, or contradict the contract's text. Specifically, the email is offered to vary the meaning of estimated budget, changing it from an "estimated budget" to a "not-to-exceed number." And the draft is offered to add to the notice provision, changing it from requiring mere notice to both notice and approval.

We hold that this evidence violates the parol-evidence rule and that the trial court erred to the extent it considered such evidence in making its ruling.[4]

_____

[4] SEU argues that Blackmon Mooring has waived any complaint about the trial court's admission and consideration of SEU's parol evidence because Blackmon Mooring did not make

16

**CONCLUSION**

We reverse the trial court's summary judgment and remand for further proceedings consistent with our opinion.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Reversed and Remanded

Filed: May 29, 2026

---

evidentiary objections to the evidence. We disagree. "Texas does not recognize waiver of the parol evidence rule merely by failure to object to the introduction of extrinsic evidence." *State Nat'l Bank v. Academia, Inc.*, 802 S.W.2d 282, 291 (Tex. App.—Corpus Christi-Edinburg 1990, writ denied). Despite its name, the parol evidence rule is not a rule of evidence; it is a rule of substantive law that defines the subject matter of contract interpretation. *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 31 (Tex. 1958); Restatement (Second) of Contracts § 213 cmt. a. "Evidence that violates the parol evidence rule has no legal effect." *Bailey v. Kliebert Dev., LLC*, No. 14-15-00984-CV, 2017 WL 924484, at \*4 (Tex. App.—Houston [14tth Dist.] Mar. 7, 2017, no pet.) (mem. op.). "Such evidence cannot be considered by the court when it construes the contract, even if the evidence is admitted without objection." *Id.*